SAGAR RAICH, ESQ.
Nevada Bar No. 13229
RICHARD KLAMKA, ESQ.
Nevada Bar No. 15258
RAICH LAW PLLC
2280 E. Pama Ln.
Las Vegas, NV 89119
Phone: (702) 758-4240
sraich@raichattorneys.com
rklamka@raichattorneys.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| JAMES HURTADO, an Individual; and STEPHANIE HURTADO, an Individual, <br><br> Plaintiffs, <br><br> vs. <br><br> KEN SUPRENANT, an Individual; and DOES 1 to 1000 and ROE entities I to L, <br><br> Defendants, <br><br> and <br><br> AGILITY CREDIT, LLC, <br><br> Nominal Defendant. | Case No.: 2:23-cv-01433-GMN-EJY <br><br> **AMENDED COMPLAINT** |

PLEASE TAKE NOTE that Plaintiffs, JAMES HURTADO and STEPHANIE HURTADO, by and through their attorneys of record, SAGAR RAICH, ESQ. and RICHARD KLAMKA, ESQ. OF RAICH LAW PLLC allege, as follows:

**PARTIES**

1. Plaintiff JAMES HURTADO ("JAMES"), is, and at all times material hereto, was an Individual residing in the state of California.

2. Plaintiff STEPHANIE HURTADO ("STEPHANIE"), is, and at all times material hereto, was an Individual residing in the state of California.

3. Defendant KEN SUPRENANT ("SUPRENANT") is, and at all times material hereto, was an Individual residing in the state of Nevada, now living in the state of Texas.

4. Nominal Defendant AGILITY CREDIT LLC ("AGILITY"), is, and at all times material hereto, was a Nevada Limited Liability Company, owned and operated by Plaintiff JAMES, Defendant SUPRENANT, and William Dale ("Dale").

5. The identities and true names of the defendants sued as DOE individuals and ROE entities are unknown to Plaintiffs, but are alleged to have acted in concert or conjunction with the named Defendants to cause the harm to Plaintiffs; Plaintiffs will seek leave of the court to substitute the name of the individual DOE or ROE defendant as that information becomes available to Plaintiffs.

### ALLEGATIONS REGARDING AGENCY

6. Based on information and belief, at all times relevant herein, Defendants and each of them, were the agents, servants, alter egos, employees, representatives, joint venturers of every other Defendant and at all times mentioned herein were acting within the course and scope of said agency, representation, employment, or joint venture, with knowledge, permission, or express or implied consent of all other named Defendants.

### JURISDICTION

7. This Court has jurisdiction over the Defendants as the parties previously agreed that the laws of Nevada would apply without regard to any conflict of law principles, and any conflict or dispute that arose between the parties shall be decided under the laws of Nevada, nominal Defendant Agility Credit, LLC is a Nevada limited liability company, Defendant Ken

Suprenant has had sufficient minimum contacts with this forum such that exercise of personal jurisdiction over them will not offend the traditional notions of fair play and substantial justice.

8. Venue is proper in this Court based on diversity jurisdiction.

**ALLEGATIONS COMMON TO ALL CLAIMS**

9. JAMES, SUPRENANT and Dale formed AGILITY, under the agreement that JAMES would initially inject $250,000 of owner equity into the business to secure funding and in recognition of his lack of experience in the industry. The parties agreed that this injection was not a loan but a personal contribution.

10. Subsequently, JAMES and STEPHANIE extended a loan of $750,000 to Agility, each providing $250,000 in personal guarantees to SUPRENANT and William Dale. The parties agreed that this injection was separate from JAMES' initial equity injection.

11. After both the initial and subsequent injections were exhausted, JAMES contributed another $75,000 in owner equity, with the parties agreeing that this too was not a loan but a direct investment in the business.

12. The parties agreed that SUPRENANT would serve as Chief Executive Officer, and Dale would provide the necessary technical knowledge to operate the business.

13. SUPRENANT and Dale agreed to each provide $250,000.00 at a later date. Initially, Suprenant and Dale agreed that they would provide their expertise and Hurtado would provide cash. Each partner would have a $250,000.00 basis value in the Company, although Hurtado was the only one with Class A shares because he was the only party who was contributing an at-risk amount in cash.

14. A Promissory Note, Loan Agreement, and Security Agreement were drafted, circulated and executed by the parties in January 2022.

15. SUPRENANT and Dale signed a personal guaranty to ensure their personal liability for the $750,000.00 loan, along with all other fees provided under the Promissory Note and Loan Agreement.

16. Revisions to AGILITY's operating agreement, the Promissory Note, Loan Agreement, and Security Agreement were agreed upon and executed by all parties on October 1, 2022.

17. SUPRENANT repeatedly reneged on his financial commitments, namely the initial $150,000.00 that he had promised, which at a minimum, would have paid the interest payments on the Hurtado loan.

18. SUPRENANT also requested and received a salary of $10,000.00 per month, which was contingent upon him adequately fulfilling his duties. The salary that SUPRENANT was to receive was agreed between the partners and accounted for in the capital account as a prepayment on future profits, and deducted from SUPRENANT's basis in the Company. The parties agreed that Hurtado and Dale would be made whole by receiving equivalent payments to whatever SUPRENANT received before SUPRENANT was to be paid an officer salary.

19. SUPRENANT was receiving advanced payments from AGILITY while simultaneously failing to make the payments owed to Plaintiffs and failing to run the Company as agreed.

20. Due to SUPRENANT's failure to honor his financial commitment, Plaintiffs had to loan an additional approximate sum of $325,000.00 to AGILITY.

21. SUPRENANT was accused of knowingly breaching a non-compete agreement with National Credit Center ("NCC"), to the detriment of Plaintiffs.

22. SUPRENANT failed to vet or validate the existence of employee non-compete agreements for individuals who had worked for NCC that he recruited to work for Plaintiffs. SUPRENANT later fabricated a story about NCC doctoring the non-compete agreements, which he subsequently denied making.

23. SUPRENANT intentionally misled Plaintiffs when he recruited individuals to work for Agility who were subject to the non-compete agreements with NCC without informing Plaintiffs of this fact.

24. SUPRENANT's intentional concealments resulted in severe legal repercussions for AGILITY and Plaintiffs, including a lawsuit.

25. Plaintiffs bore the financial burden of litigation expenses in the legal proceedings initiated by NCC with respect to the non-compete agreements.

26. SUPRENANT deliberately failed to fulfill the commitment to provide any of the $250,000.00 owed to Plaintiffs, including but not limited to the $150,000.00 he promised upon the sale of his home.

27. Rather than honoring his prior financial obligations and the promises that he made to JAMES and AGILITY, SUPRENANT used the proceeds from the sale of his Las Vegas home to purchase a million-dollar residence in Texas.

28. In addition, rather than honoring his prior financial obligations and the promises that he made to JAMES and AGILITY, SUPRENANT merely attempted to resign from his position at AGILITY by email on May 18, 2023, walk away from any further responsibilities as a CEO or Personal Guarantor, and abandon all responsibility in his obligations towards over $250,000.00 in past due payables.

29. On May 15, 2023, Plaintiffs formally notified AGILITY and SUPRENANT of the default on the loan agreement.

30. Plaintiffs suffered financial harm including the loss of the initial $750,000.00, an additional $325,000.00 cash injection, $22,500.00 in accrued interest, $1,125.00 in late fees, attorney's fees, and related expenses.

**FIRST CLAIM FOR RELIEF**

BREACH OF CONTRACT

*(Plaintiffs Against Defendant AGILITY)*

31. Plaintiffs hereby repeat, re-allege, and incorporate by reference herein all allegations in this Complaint.

32. On October 1, 2022, Plaintiffs executed a loan agreement, promissory agreement, and security agreement with AGILITY.

33. The terms of the agreements provided that Plaintiffs would loan $750,000.00 to AGILITY, whereby SUPRENANT would personally guarantee $250,000.00 and Dale would personally guarantee $250,000.00.

34. Plaintiffs fully performed their duties by providing AGILITY with an initial loan of $750,000.00.

35. The Agreement provided that AGILITY was to repay the $750,000.00 to Plaintiffs at a later date.

36. AGILITY breached the agreement by failing to perform any actions under the Agreement or in furtherance of the Agreement from the time that funds were received from Plaintiff.

37. Initially, AGILITY made interest payments but never paid any principal on the loan as it promised and as SUPRENANT and Dale guaranteed.

38. As a direct and proximate result of AGILITY's actions, Plaintiffs have suffered damages in excess of $75,000.00.

39. Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**

BREACH OF PERSONAL GUARANTY

*(Plaintiffs Against Defendant SUPRENANT)*

40. Plaintiffs hereby repeat, re-allege, and incorporate by reference herein all allegations in this Complaint.

41. On October 1, 2022, SUPRENANT executed an Amended and Restated Personal Guaranty (the "Personal Guaranty") in connection with the $750,000.00 loan agreement and promissory note between Plaintiffs and AGILITY.

42. The Personal Guaranty provided that it was being given in consideration of the extension of credit by Plaintiffs, that SUPRENANT would personally guarantee $250,000.00, and that SUPRENANT would undertake the timely performance of all duties, covenants, conditions and obligations of pursuant to the terms of the loan agreement and promissory agreement.

43. SUPRENANT ultimately breached the terms of the loan agreement and promissory agreement and breached the terms of the Personal Guaranty by failing to honor his financial obligations under the loan and promissory agreement, as well as failing to carry out the duties, covenants, conditions and obligations that formed the basis of the loan agreement and the Personal Guaranty.

44. Despite demand for payment and notice of the default, SUPRENANT has failed and refused to make any payments or fulfill his obligations under the loan agreements or the Personal Guaranty.

45. As a direct and proximate result of SUPRENANT's actions, Plaintiffs have suffered damages in excess of $75,000.00.

46. Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF

BREACH OF GOOD FAITH AND FAIR DEALING

*(Plaintiffs Against Defendant SUPRENANT)*

47. Plaintiffs hereby repeat, re-allege, and incorporate by reference herein all prior allegations in this Complaint.

48. SUPRENANT executed the Personal Guaranty for Plaintiffs' loan agreement and promissory note with AGILITY, which set forth the rights and obligations of the parties.

49. SUPRENANT breached the loan agreements and the Personal Guaranty by failing to perform the substantial duties owed to Plaintiffs, specifically, but not limited to, by failing to make any payments to Plaintiffs.

50. Pursuant to the Personal Guaranty, SUPRENANT would be held personally liable for $250,000.00 of the $750,000.00 that Plaintiffs loaned to AGILITY.

51. SUPRENANT breached his duty of good faith and fair dealing and engaged in grievous and perfidious misconduct by acting in a manner unfaithful to the purpose of the written agreements between the parties, including such was as evading inquiries from Plaintiffs, deliberately delaying the fulfillment of his contractual obligations, making false financial promises he had no intention of honoring, and concealing material facts from Plaintiffs.

52. Plaintiffs' expectations that SUPRENANT would act in a manner faithful to the contracts entered into between the parties were justified, in that Plaintiffs justifiably believed SUPRENANT would not repeatedly renege on his financial commitments, including the promised initial $150,000, that he would not expose AGILITY to lawsuits by knowingly recruiting individuals with enforceable non-compete agreements, which financially damaged

AGILITY, and that SUPRENANT would not attempt to resign from his position as CEO of AGILITY, abandoning all responsibilities as CEO and his obligations as a Personal Guarantor.

53. Although Plaintiffs entered into the written agreements with SUPRENANT, and SUPRENANT was bestowed the title of CEO, SUPRENANT failed to honor the intention and spirit of the agreements because Plaintiffs never would have done agreed to contract with SUPRENANT if SUPRENANT had been truthful about his actual and eventual intentions regarding honoring those agreements; by knowingly exposing AGILITY to litigation; by failing to fulfill his duties as CEO; and by abandoning his financial obligations.

54. SUPRENANT owed Plaintiffs a duty to appropriately honor the financial and professional obligations entrusted to him by AGILITY and by Plaintiffs, which he failed to do.

55. SUPRENANT's actions and omissions demonstrate a willful disregard for Plaintiffs' rights and interests, and a failure to act in good faith.

56. As a direct and proximate result of SUPRENANT's actions, Plaintiffs have suffered damages in excess of $75,000.00.

57. Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to reasonable attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**

UNJUST ENRICHMENT

*(Plaintiffs Against Defendant SUPRENANT)*

58. Plaintiffs hereby repeat, re-allege, and incorporate by reference herein all prior allegations in this Complaint.

59. The Loan Agreement entered into between the parties provided that Plaintiffs, James and Stephanie Hurtado served as LENDER and AGILITY served as BORROWER.

60. The Loan Agreement provided that SUPRENANT and Dale served as GUARANTORS.

61. Therefore, in this context, AGILITY acted as the borrower, with Plaintiffs supplying the funds.

62. The Guaranty executed between the parties was between SUPRENANT and Dale as Guarantors, in favor of Plaintiffs and did not provide for AGILITY in any Guarantor capacity.

63. At all times, SUPRENANT was aware that the funds specified in the Loan Agreement were being provided by Plaintiffs.

64. In fact, before and after the execution of the Loan Agreement and Personal Guaranty, SUPRENANT only communicated with Plaintiffs about the financial terms of the agreements, the purpose of which involved SUPRENANT fulfilling his duties as CEO as represented, and fulfilling his financial obligations as represented.

65. SUPRENANT breached his duties to AGILITY and to Plaintiffs by exposing the business to litigation, causing financial damage, ignoring his financial obligations to the business and to Plaintiffs, and abandoning his duties to the business, before summarily *"resigning"* by email.

66. SUPRENANT ultimately received significant financial benefits from his actions in executing these agreements and establishing dominion over Plaintiffs' property, including but not limited to Plaintiffs' initial $750,000.00 in AGILITY, payment of $160,000.00 against future earnings, and $250,000.00 for which SUPRENANT was personally responsible.

67. SUPRENANT has received significant financial rewards as a result of the amounts withheld from Plaintiffs.

68. As a direct and proximate result of SUPRENANT's actions, Plaintiffs have suffered damages in excess of $75,000.00.

69. Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to reasonable attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF

FRAUD

*(Plaintiffs Against Defendant SUPRENANT)*

70. Plaintiffs hereby repeat, re-allege, and incorporate by reference herein all prior allegations in this Complaint.

71. Throughout the business relationship, SUPRENANT represented to Plaintiffs that AGILITY would be financially successful and profitable to a great extent, and that Plaintiffs would receive a significant return on the loan they made.

72. SUPRENANT made these representations to induce Plaintiffs into loaning AGILITY $750,000.00 and paying him $160,000.00, although he had no intent of providing Plaintiffs with a return on their loan, and he concealed from Plaintiffs that he had no intention of honoring his contractual agreements to them.

73. SUPRENANT's actions in knowingly hiring employees subject to a non-compete agreement and failing to properly address the non-compete agreements resulted in a lawsuit against Agility.

74. In January 2022 and October 2022, when SUPRENANT signed the Personal Guaranty and revised Personal Guaranty, he represented to Plaintiffs that he would provide them with the agreed-upon amount of $250,000.00 to repay them for their initial loan to AGILITY.

75. When Plaintiffs would ask SUPRENANT about honoring his financial agreements, he would routinely tell them that he was in the midst of cashing out savings accounts or retirement accounts which would enable him to honor those financial commitments, or that once he sold his home in Las Vegas, he would use the proceeds from the sale to do so. SUPRENANT pleaded with Agility to continue paying him or appear that he was being paid, in an effort to obtain a larger home loan.

76. Agility provided a one-week loan for $10,000.00 on the condition that SUPRENANT would pay that loan back the following week, which he did. However, after the sale of his Las Vegas home and the purchase of his Texas home, no such funds were tendered to Plaintiffs to satisfy his underlying financial obligations.

77. SUPRENANT used the proceeds from the sale of his home in Las Vegas to purchase a home in Texas, further evidencing that he never had any intent to repay Plaintiffs.

78. Each of SUPRENANT's representations were false, as Plaintiffs did not receive the promised return on the loan they made, Suprenant did not honor his commitments and duties as CEO as represented, nor did Plaintiffs receive the $250,000.00 owed by SUPRENANT.

79. SUPRENANT knew that each of his representations were false at the time they were made, as he never had any intent to fulfill his obligations or provide any payment to Plaintiffs.

80. On April 29, 2013, SUPRENANT began his employment with National Credit Center ("NCC").

81. SUPRENANT served as Senior Vice President of New Verticals in that position.

82. SUPRENANT was terminated from that position on August 31, 2020.

83. In accepting that position, SUPRENANT was required to sign non-compete agreements as a condition of employment and was aware that employees of NCC were also required to sign non-compete agreements as a condition of employment.

84. Plaintiffs, cognizant of SUPRENANT's extensive industry background, appointed him as CEO with specific responsibilities such as prospect outreach and employee recruitment for AGILTY.

85. In doing so, Plaintiffs entrusted SUPRENANT with these duties under the agreement that he would safeguard the company from adverse actions or prolonged legal disputes.

86. When recruiting and hiring new employees like Shannon Free on November 1, 2021, Mark Gray on January 3, 2022, and Tim Pollack on January 31, 2022, whom SUPRENANT knew or was familiar with from his experience at NCC, SUPRENANT neglected to disclose the existence of the NCC non-compete agreements to Plaintiffs.

87. Plaintiffs only learned about the NCC non-compete agreements after AGILTY was sued as a result of SUPRENANT's actions in recruiting and employing for NCC employees.

88. SUPRENANT, as CEO of AGILITY and a former Vice President of NCC, was aware of the NCC non-compete agreements but he concealed them from Plaintiffs. These agreements only came to light after AGILITY was sued as a result of SUPRENANT's intentional actions.

89. SUPRENANT intentionally misled Plaintiffs regarding the eligibility of the individuals he recommended for employment and who were employed by AGILITY, who were in fact bound by non-compete agreements with NCC.

90. Each of these statements and misrepresentations by Defendant SUPRENANT were made with the intention of inducing Plaintiffs to continue their financial support and loans to AGILITY, as well as paying SUPRENANT his annual salary, all of which Defendant SUPRENANT could use for personal gain.

91. Plaintiffs had no knowledge that any of these representations were false or that SUPRENANT was concealing these material facts.

92. SUPRENANT engaged in a pattern of deceit and evasive behavior, including avoiding inquiry by Plaintiffs and intentionally delaying the fulfillment of his employment and financial obligations, in order to mislead and deceive Plaintiffs for his personal gain.

93. Plaintiffs reasonably relied, to their detriment, upon SUPRENANT's false representations and concealment.

94. As a direct and proximate result of SUPRENANT's actions, Plaintiffs have suffered damages in excess of $75,000.00.

95. Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to reasonable attorneys' fees and costs.

96. The aforementioned actions of Defendant SUPRENANT were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

**SIXTH CLAIM FOR RELIEF**

BREACH OF CONTRACT

As to Operating Agreement

*(Plaintiffs Against Defendant Suprenant)*

97. Plaintiffs hereby repeat, re-allege, and incorporate by reference herein all allegations in this Complaint.

98. On October 1, 2022, SUPRENANT, along with James and Dale, entered into an agreement titled "Operating Agreement for Agility Credit LLC, a Nevada Limited Liability Company" (the "Operating Agreement").

99. Article 4, "Members and Membership Interests," § 4.3.2 of the Operating Agreement states:

> Members or their Affiliates shall not, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, or render services or advice to, any business whose products or activities compete in whole or in part with the business or other products or activities of the Company, whether current, former or prospective, anywhere within any geographic region that the Company conducts or reasonably could conduct its Business or activities.

100. SUPRENANT is currently employed by SNH Management Company, LLC ("SNH").

101. SNH is a direct competitor of Agility.

102. SUPRENANT is aware of the fact that SNH operates as a direct competitor of Agility.

103. SUPRENANT is fully cognizant of the obligations and agreements outlined in § 4.3.2 of the Operating Agreement, which explicitly forbid him from engaging in employment with SNH.

104. Before initiating this lawsuit, SUPRENANT was notified by attorneys for Agility that his current employment with SNH was in direct violation of § 4.3.2 of the Operating Agreement.

105. Moreover, SUPRENANT was made aware that SNH was already bound by a non-disclosure agreement it entered into with Agility during prior negotiations between Agility and SNH.

106. Notwithstanding, SUPRENANT remains employed by SNH in direct violation of the terms of the Operating Agreement.

107. The Operating Agreement provided that SUPRENANT was not to render services to any business that competes with Agility.

108. SUPRENANT breached the Operating Agreement by becoming employed by, or otherwise rendering services to SNH.

109. In addition to the aforementioned, SUPRENANT attempted to "resign" from his position of CEO on May 18, 2023.

110. Prior to that time, AGIILTY entered into a Mutual Non-Disclosure/Non-Circumvent Agreement (the "ARG Agreement") dated January 23, 2023 between AGILITY and Automotive Resource Group, Inc. ("ARG"), a competitor or peer in the industry.

111. The ARG Agreement was signed on behalf of ARG by Richard Zeller, its President.

112. Ultimately, the potential transaction between AGILITY and ARG did not consummate.

113. Despite SUPRENANT's position as CEO of AGILITY at the time, both during and after the unsuccessful transaction, SUPRENANT utilized AGILITY's pricing and financial data to maintain a relationship with ARG keep them as a customer of NCC and SNH.

114. The ARG Agreement provided that confidential information would be disclosed and the parties agreed, *inter alia,* that they would only use this information for the purpose of evaluating a potential business transaction.

115. In follow-up conversations between Richard Zeller and Plaintiff James Hurtado, Zellner admitted that SUPRENANT had been in contact with him and with ARG before, during and after SUPRENANT's resignation from AGILITY.

116. In follow-up conversations between others, others admitted that SUPRENANT had been actively engaged with ARG before he resigned from AGILITY.

117. SUPRENANT's actions involving ARG were a breach the Operating Agreement by actively engaging with ARG, a competitor or peer, providing ARG with information known only to AGILITY, before, during and after his resignation from AGILITY.

118. As a direct and proximate result of SUPRENANT's actions, Plaintiffs have suffered damages in excess of $75,000.00.

119. Plaintiffs have been required to retain the services of an attorney to prosecute this action and are entitled to reasonable attorneys' fees and costs.

### SEVENTH CLAIM FOR RELIEF

DECLARATORY JUDGMENT

*(Plaintiffs Against Defendant SUPRENANT)*

120. Plaintiffs hereby repeat, re-allege, and incorporate by reference herein all allegations in this Complaint.

121. Plaintiffs seek a determination of rights and obligations under SUPRENANT's personal guaranty of the loan agreement and promissory note with AGILITY.

122. That an actual, justiciable controversy has arisen between the parties regarding the actions taken by SUPRENANT in failing to honor the terms of the agreements and denying Plaintiffs the payment they are owed.

123. The interests of Plaintiffs and SUPRENANT are adverse as both sides are attempting to lay claim and use of the monetary funds and corporate opportunities.

124. Plaintiffs have a legally protectable interest in the controversy as they have fulfilled their obligations under the initial agreement and have been denied what they are owed.

125. Plaintiffs seek and are entitled to a declaratory judgment that SUPRENANT has abandoned his duties as CEO of AGILITY, that SUPRENANT owes Plaintiffs $250,000.00 as a personal guarantor of the loan agreement and promissory note with AGILITY, and that as a result of his actions, SUPRENANT's Membership Interest and Percentage Interest in AGILITY be terminated.

126. A declaration of these rights and obligations is appropriate and will promote judicial efficiency.

127.    The underlying issues are ripe for judicial determination as a declaratory judgment as SUPRENANT is actively withholding and profiting from the monetary funds that are the rightful property of Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

1. For general damages according to proof;
2. For special damages according to proof;
3. For compensatory damages according to proof;
4. For incidental damages according to proof; and,
5. For injunctive, attachment, and other equitable relief;
6. For triple damages pursuant to statute;
7. For punitive damages according to proof;
8. Reasonable Attorney's fees; and,
9. Costs of suit; and,
10. For such other and further relief that the Court may deem appropriate or equitable.

Dated this 3rd day of 2024.

/s/ Sagar Raich
SAGAR RAICH
NEVADA BAR 13229
RICHARD KLAMKA
NEVADA BAR 15258
RAICH LAW PLLC
2280 E. Pama Ln.
Las Vegas, NV 89119
*Attorneys for Plaintiffs*